CLERK
U.S. BANKRUPTCY
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

2007 MAY -3  P  7: 17

| | |
|---|---|
| Linda Cruz-Packer | RECEIVED |
| 4800 Megan Drive | ) |
| Clinton, Maryland 20735 | ) |
| | ) |
| Plaintiff | ) |
| v. | ) |
| | ) |
| | )    **Civil Action No: 06-2263** |
| | ) |
| **Pili Robinson, Senior Consultant** | )    **(RWR)** |
| Department of Youth Rehabilitation | ) |
| The Missouri Youth Service Institute | ) |
| 1906 Hayselton, Drive | ) |
| Jefferson City, MO 65109 | ) |

**RECEIVED**

MAY 3 - 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA
2007 MAY -8  PM 7: 18
M. WHITTINGTON

## PLAINTIFF'S OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS COMPLAINT

Pursuant to your order dated February 7, 2007, the plaintiff, Linda Cruz-Packer hereby opposes the December 26, 2006, motion of the defendant Pili Robinson put forth to dismiss the above complaint against him pursuant to Civ. P. Rule 12 (b) (5) (6) and all other arguments filed by Attorney Andrew T. Wise, counsel for Pili Robinson. In addition, please refer to plaintiff's response to other DYRS defendant's motion to dismiss submitted previously by plaintiff on January 30, 2007.

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## PLAINTIFF'S OPPOSTION TO DEFENDANT'S MOTION TO DISMISS
## COMPLAINT

1. On November 29, 2006, Plaintiff made a prima facie case in that the

Plaintiff contends the termination to be a wrongful termination and that the defendants'

actions were adversarial, malicious, and retaliative, resulting in discrimination, actionable

retaliation to activity that affected the terms and conditions of the Plaintiff's employment,

breach of contract, tortuous interference with the contract, intentional infliction of

Linda Cruz-Packer V. Pili Robinson
Linda Cruz-Packer V. Department of Youth Rehabilitation Services et. All
Opposition to all Defendant's and Pili Robinson's Motion to Dismiss Complaint
emotional stress, negligent infliction of emotional stress, retaliatory discharge, and

defamation of the Plaintiff's character.


2. The defendant is a paid consultant of the Department of Youth Rehabilitation Services

(DYRS), procured by contract.


3. The defendant was presented by the Director of DYRS as **an expert in youth**

**services and programs**. In addition, the defendant described his skills and abilities as

expert level in youth services and programs.

4. The complaint, summons, and initial order were mailed to the defendant at his business

address in Jefferson City Missouri by certified mail.

5. Service of process was completed by mailing a copy of the complaint, summons, and

initial Order by certified mail; return receipt requested (SCR-Civ. 4(e) (2) to the

defendant.

6. Defendant has set on interview boards and inputted on staff disciplinary decision, in so

determining retention and firing status, and making decisions on potential employee's

becoming DYRS staff.

7. Mark Stewart, the person authorized to sign for and receive mail delivered to the

defendant's place of business in Jefferson City, Missouri, signed for and received the

copy of summons, complaint, and initial order mailed to the defendant.

8. Defendant's attorney, Mr. Wise, confirmed defendant's address (The Missouri Youth

Service Institute, 1906 Hayselton Drive, Jefferson City, MO. 65109) by representing

defendant's address in motion from defendant.

Linda Cruz-Packer V. Pili Robinson
Linda Cruz-Packer V. Department of Youth Rehabilitation Services et. All
Opposition to all Defendant's and Pili Robinson's Motion to Dismiss Complaint

9. In Clair v. District of Columbia Department of Employment Services, the proper

measure of damages in a public-policy wrongful discharge action is the sum of any wages

that an employee actually earned or could have earned with reasonable diligence,

additionally; an employee may recover for any other tangible benefit lost as a result of

the termination.

10. Since the decision in Foley v. Interactive Data Corporation, damages for emotional

distress and punitive damages can only be recovered in public policy cases,

discrimination cases and independent tort cases.

### ARGUMENT

Defendant argues that the "Complaint should be dismissed against him pursuant

to Superior Court Civil Rule 12(b)(5) for insufficiency of service process". See

Defendant's Memorandum of Points and Authority at p.3. Defendant further wrongly

argue that the "Complaint should be dismissed pursuant to Superior Court Rule 12(b) (6)

for failure to state a claim upon which relief can be granted." Id at p.3.

A.  **Defendant Is Not Entitled to Relief Under Civil Rule 12(b)( 5)of the**
    **Superior Court of Civil Procedure**

The defendant's motion misapplies the relevant facts of law.  The plaintiff met his

obligation to serve a copy of the summons, along with the complaint and initial order

upon the defendant in accordance with the provisions of Superior Court Civ. R

4(b)(1)(4). The defendant argues that the plaintiff failed to follow the procedures as set

3

Linda Cruz-Packer V. Pili Robinson
Linda Cruz-Packer V. Department of Youth Rehabilitation Services et. All
Opposition to all Defendant's and Pili Robinson's Motion to Dismiss Complaint
forth in Superior Court Civ. R. 4(d)(1). See defendant's Memorandum of Points and

Authorities at p.3.    According to the Superior Court Rules of Civil Procedure, the

provision of Civ. R. 4(d) is vacant. The District of Columbia Superior Court Civil Rules

establish in pertinent part, parallel service requirements to those contained in Rule 4(c)(2)

of the Federal Rules of Civil Procedure. See DC SUPER. CT. R (e) (2).


United States District Court Rules for the District of Columbia, Rule LCvR 5.3

relating to proof of service states that proof shall show the date and manner of service,

and may be by certificate of an attorney of record or other proof satisfactory to the Court.

Failure to make proof of service does not affect the validity of service. (120 (b) (5) of the

Superior Court of Civil Procedure is no longer relevant since this case is now under the

United States District Court rules.


Rule 4© of the DC Superior Court Rules permits service to be effective upon an

individual "by mailing a copy of the summons, complaint and initial order to the person

to be served by registered or certified mail, return receipt requested. D.C. SUPER.CT.

CIV.R. 4( c ) (3). Leaving a copy of the complaint and summons at an individual

defendant's place of business constitutes valid service if it id left in the hands of "an

agent authorized to appointment or by law to receive service of process. "FED.R.CIV.P

4(e). Mark Stewart was identified as the person authorized at the defendant's place of

business to receive and sign for mail addressed to the defendant.  See Parker v. Frank

Emmet Real Estate.  451 A. 2d 63. 66 (D.C. 1982);   Morfessis v. Marvins Credit,

77A.2d.178. 179. (D.C. 1950).

Linda Cruz-Packer V. Pili Robinson
Linda Cruz-Packer V. Department of Youth Rehabilitation Services et. All
Opposition to all Defendant's and Pili Robinson's Motion to Dismiss Complaint

The Defendant is a business acquaintance of Deputy Superintendent Dexter Dunbar. While accompanying Dunbar around the facility the defendant passed out business cards listing a Jefferson City, Missouri address as his place of business. A reasonable person would assume that the defendant intends for all matters related to his business are to be forwarded to his business address. Further, the defendant received the summons the complaint, the initial order and the attended complaint and responded to the complaint in a timely fashion by filing a motion to dismiss the complaint against him via legal counsel. In addition, the defendant's counsel lists the defendant's address on his response papers i.e. motion to dismiss with his Jefferson City, Missouri address. Based on the points stated above, the defendant's argument of insufficiency of service of process is not valid.

B.   **Defendant is Not Entitiled to Relief Under Rule 12(b) (6) of the Superior Court Rule of Civil Procedure**

1.) A motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to rule 12 (b) (6) should not be granted only when it is clear beyond a reasonable doubt that the plaintiff would not be entailed to relief under any set of facts that could be proven in support of the claim. Bruno v. Criterion Holdings, Inc. 736 A.2d 99, 99 (R.I. 1999). The complaint must be construed in light of the most favorable to the plaintiff and its allegations taken as true. McBryde v. Amoco Oil Co., 404 A. 2d200 (D.C. App 1979).

2.) The plaintiff alleges that the defendant contributed to the wrongful termination of the plaintiff through (his) actions that were adversarial, malicious, retaliative resulting in

Linda Cruz-Packer V. Pili Robinson
Linda Cruz-Packer V. Department of Youth Rehabilitation Services et. All
Opposition to all Defendant's and Pili Robinson's Motion to Dismiss Complaint

discrimination, actionable retaliation to activity that affected the terms and conditions of

the Plaintiff's employment, intentional infliction of emotional stress, negligent infliction

of emotional stress, retiraliatory discharge and defamation of the Plaintiff's character. In

principle, the tortuous liability runs parallel to the liability contract. Subject to the rules

of privacy of contract, one who has entered into a contract can sue or be sued on the

contract which set out the terms of the service to be provided by the professional person,

and if there is no express term to this effect, there will be an implied term that the service

will be performed with reasonable care and skill, per $13 Supply of Goods and Services

Act 1982.

3.) The Plaintiff raises the issue that the individual defendant has expressly or impliedly

represented skills and abilities in excess of the ordinary person. The usual rules to

establish negligence rely on establishing that a duty of care is owed by the defendant to

the claimant, and that the defendant is in breach of that duty. The standard test of breach

is whether the defendant has matched the abilities of a reasonable person. But, by virtue

of the services they offer and supply, professional people hold themselves out as having

more than average abilities. The Bolan test derived from Bolan v. Friern Hospital

Management Committee (1957) 1 WLR 583, determines the standards against which to

measure the legal quality of the services actually delivered by those who claim to be

among the best in their fields.

4.) This Employee contends that she was wrongfully terminated. The Employee contends

that the Department of Youth Rehabilitation Services terminated her employment, at the

recommendation of LaVern Evans, Superintendent, along with strong recommendation

from Pili Robinson in retaliation for her participation in an investigation (witness) of

Linda Cruz-Packer V. Pili Robinson
Linda Cruz-Packer V. Department of Youth Rehabilitation Services et. All
Opposition to all Defendant's and Pili Robinson's Motion to Dismiss Complaint
sexual harassment claims against other managers 8, Section 9.4 (a) (b) 1, 2,3, and for

writing an overview of the Genesis Program that was very unflattering to the defendant
Robinson

5.)The Plaintiff contends that her termination was motivated by discrimination on the

basis of the Plaintiff's race (African-American), age (55), and sex (Female). In addition

retaliation based on her participation in the administrative complaint process

investigation conducted by a Ms. Geiger, identifying discrepancies and mismanagement

by Deputy Superintendent Dunbar and Senior Consultant Robinson, and her constantly

requests for investigations into matters of concerns at Oak Hill, which required

management to actually work in violation of her First Amendment Rights, the 1994 Fair

Employment practices, the National Labor Relations Act of 1935, anti retaliation laws,

and civil service laws.

6.)  Wherefore, the Employee request the court to intervene, and reinstatement of her

MSS service status position within the agency or some where else in the District

Government for which she is qualified, and or award her damages in the amount of  for

the wrongful termination, correct her pay grade to 12,

7.) The Employee contends the termination to be a wrongful termination and that the

Agencies' actions were adversarial, malicious, and retaliative, resulting in discrimination,

actionable retaliation to activity that affected the terms and conditions of the Employee's

employment, breach of contract, tortuous interference with the contract, intentional

infliction of emotional stress, negligent infliction of emotional stress, retaliatory

discharge, and defamation of the Employee's character.

8.) The termination decision as well as the inauspicious actions of the Agency has caused

Linda Cruz-Packer V. Pili Robinson
Linda Cruz-Packer V. Department of Youth Rehabilitation Services et. All
Opposition to all Defendant's and Pili Robinson's Motion to Dismiss Complaint

personal injury to the Employee, causing emotional stress, economic losses, and other

punitive damages, and for the reasons expressed below, the Employee concludes that the

Department of Youth Rehabilitation Services' charge upon which the termination

decision was based is a wrongful termination.

Defendants failed to provide adequate training in the respective positions they

assigned the Plaintiff to occupy.  However, despite the absence of training, the Plaintiff

performed her duties and responsibilities in an excellent manner, as a result of her

educational background, previous employment, and experiences in comparable positions

within the profession.

9)      Further, the Defendants, acting within the scope of their employment, failed to

adjust the plaintiff pay after she brought the discrepancies to the attention of the

Defendants, while compensating similarly situated persons who are at least forty years

10)      Further, when the Plaintiff documented the deficiencies at Defendant DYRS Oak

Hill Youth Center, the Defendants acting within the scope of their employment, retaliated

against the Plaintiff and removed her from the position as Shift Commander. (See
attached Genesis Overview)

11.) Wrongful discharge actions for violating public policy can be premised on one of

three grounds:

a) Explicit legislative statements prohibiting discharge, discrimination or adverse

treatment of employees who act in accordance with the statutory right or duty;

b) "Legislative expression of policy" - for example, discharging an employee for

refusing to violate the law during employment; or,

c) Retaliatory discharge.

12). Title VII of the Civil Rights Act of 1964 forbids employment discrimination against

8

Linda Cruz-Packer V. Pili Robinson
Linda Cruz-Packer V. Department of Youth Rehabilitation Services et. All
Opposition to all Defendant's and Pili Robinson's Motion to Dismiss Complaint
"any individual" based on that individual's "race, color, religion, sex, or national origin."

Pub. L. 88-352, §704, 78 Stat.257, as amended, 42 U.S.C. §2000e-2(a). A separate

action of the Act – its anti-retaliation provision – forbids an employer from

"discriminating against" an employee or job applicant because that individual "opposed

any practice" made unlawful by Title VII or "made a charge, testified, assisted, or

participated in" a Title VII proceeding of investigation. §2000e-3(a).

In Philip's v Butterball Farms Co, 448 Mich 239 (1995), the Michigan Supreme Court

resolved a conflict in the Court of Appeals and held that a claim of retaliatory discharge

sounds in tort and not in contract. Consequently, the full tort remedies are available for a

retaliatory discharge in violation of public policy.

13.) The employee was hired on or about April 3, 2006, as a Supervisory Correctional

Officer. She was wrongfully terminated on about November 3, 2006.

14.) The employee is a Veteran and served in the United States Army and is entitled to

Veterans Preference, and received an honorable discharge on July 3, 1973.

15.) The Plaintiff contends and has reason to believe that the defendant in his capacity of

Senior Consultant Expert of Youth Services and Programs to the DYRS, provided advice

to the Director of DYRS that contributed in part to the Director's decision to terminate

the Plaintiff. Robinson did this by dictating policy and procedures to Staff at

management meetings. Stating on numerous occasions that DYRS did not need OD's

(Shift Commanders) which was the one of the acting position plaintiff held prior to being

dismissed. Defendant was constantly dictating policy and procedure to government

employees. With no authorization he constantly checked with employees at the gate on

other MSS staff comings and goings. Even though he protested that he was not a DYRS

Linda Cruz-Packer V. Pili Robinson
Linda Cruz-Packer V. Department of Youth Rehabilitation Services et. All
Opposition to all Defendant's and Pili Robinson's Motion to Dismiss Complaint
employee defendant was allowed to set on interview boards and was allowed to evaluate

and make decision concerning the hiring and firing of potential and former employees. In

addition, defendant was allowed to set staff schedules and participate in employee's

reassignments. The Bolan principle addresses the first element. However, Hedley Bryne

& Co. Ltd. V. Heller & Partners Ltd. (1964) AC 465 created the rule of "reasonable

reliance" by the claimant on the skills of the defendant.

16.) Further the defendant. Often disclosed in management meetings, in which plaintiff

was present, the authority granted to him by the Director to oversee parts of the Oak Hill

Youth Center.

The Plaintiff in this case from this point on will be referred to as employee states

the following:

1.) Employee was employed as a DS-006 Grade 11 Supervisory Youth Correctional

   Officer, working in an acting position as a limited manager at the Respondent's Oak

   Hill Youth Center.

2.) Employee is a Veteran and served in the United States Army and is entitled to

Veterans Preference. Subsequently, Plaintiff should have been release last if MSS

employee had to be release. However, other MSS employees were retained who were not

veterans. **Note:** On or about November 3, 2006, the Respondent terminated the

Employee as a result of the Employee's status as an MSS Employee.

3.) Employee was placed in at least 5 different positions within a 7 month period that

no other MSS employee was subjected to. It is the Employee opinion that some of these

positions came about at the insistence of the Defendant Pili, who was acting outside of

his role as a senior consultant.

10

·Linda Cruz-Packer V. Pili Robinson
Linda Cruz-Packer V. Department of Youth Rehabilitation Services et. All
Opposition to all Defendant's and Pili Robinson's Motion to Dismiss Complaint

2.) Employee was denied appropriate staffing when transferred to Genesis as its unit manager. The Defendant sabotaged most efforts to make Genesis a success through various processes including demeaning employee in front of her staff, sitting in on staffing meetings and disrupting the flow of the daily operations in Genesis, limited his oversight and training of the Employee.

3.) Employee was denied proper training either formally or informally by the defendant who made up constant excuses of not providing OJT or allowing employee to receive specialize training to make her mission and goals as the new unit manager at Genesis a success.

4.) Employee notified Superintendent Evans of the Defendant's efforts and discriminatory measures he and Deputy Superintendent Dexter Dunbar were engaging in concerning the Genesis Program and conflicting information being provided to the youths housed in Genesis.

5.) Employee wrote an overview of the Genesis program and from that date forward Employee was subjected to a hostile work environment by the defendant and several other DYRS managers.

6.) Employee subsequently received Personnel Action Form indicating that she was subject to a termination. The termination did not conform to the District of Columbia Personnel Manual DPM.

7.) Defendant Robinson was extremely harmful to the Plaintiff when he attempted to cancel the Shakespearean program that the youths in Genesis were involved in.

8.) The Defendant Robinson and the other DYRS Defendants failed to follow the parameters of the performance management program, D.C. Official Code  § § 1-

·Linda Cruz-Packer V. Pili Robinson
Linda Cruz-Packer V. Department of Youth Rehabilitation Services et. All
Opposition to all Defendant's and Pili Robinson's Motion to Dismiss Complaint

609.51 through 1-609.58 (2001), which is the systematic process by which an agency

involves its employees, as individuals and members of a group, in improving

performance in the accomplishment of agency mission and goals (DPM 1402.1).

Subsequently, the Respondent failed to a) Communicate and clarify organizational

goals to employees; (b) Identify individual and, where applicable, team

responsibilities and accountability for accomplishing organizational goals; (c)

Identify and address developmental needs for individuals and, where applicable,

teams; (d) Assess and improve individual, team, and organizational performance; (e)

Use appropriate measures of performance as the basis for recognizing and rewarding

accomplishments; and (f) Use the results of performance appraisal as a basis for

appropriate personnel actions (DPM 1402.2a-f).

9.) Defendant Robinson and Deputy Superintendent Dunbar conspired to prevent

needed youth from entering the program, and they orchestrated a concerted effort to

deny this employee's commencement of many of the programs recommended and

detailed in the Genesis Overview.  When this matter was brought to the

Superintendent's attention the Defendant and his close friend Dunbar recommended

this Employee be terminated.

10.) Further, as an Employee of the District of Columbia government, the Employee

was never informed of any deficiencies in her work performance in a timely manner,

throughout the rating period so that, to the extent possible, she should be given an

opportunity to overcome such deficiencies and improve her performance (DPM

1402.3a).  Each supervisor shall complete a Performance Plan outlining what is

Linda Cruz-Packer V. Pili Robinson
Linda Cruz-Packer V. Department of Youth Rehabilitation Services et. All
Opposition to all Defendant's and Pili Robinson's Motion to Dismiss Complaint

expected for each covered employee (DPM 1406.1). The Employee was not given a

Performance Plan as dictated in the DPM. Therefore, the reason of poor performance

is not valid if the DYRS has failed to identify and discuss with the employee

performance competencies, and how each competency would relate to the employee's

job. (DPM 1406.1 through 1409.3).

This plaintiff is a pro se litigant attempting to pursue remedy for a wrong that has

befallen her. While this complaint does indeed overcome a rule 12(b) (6) challenge. It

does so in a very unique matter. Considering the plaintiff was an MSS employee with

no MSS power or job responsibilities granted other MSS employees in her position.

Neither DYRS nor the defendant had any right to terminate her since they made up

reasons as to her termination after accepting erroneous and misleading information

supplied by the Defendant and other DYRS managerial managers.

Dismissal for failure to state a claim upon which relief can be granted is impressible

unless it appears beyond doubt that the plaintiff can prove no set of facts in support of her

claim which would entitle her to relief. Owens v. Tiber Island Condominium Ass'n 373

A.2d 890 (D.C. App 1977).

**WHEREFORE** , the premises considered, the Plaintiff prays:

a.  that this court enjoin the Defendant and the other Defendants, their agents,

servants and or employees,  acting within the scope of their employment  from

continuing to engaged in the unlawful acts of discrimination against the Plaintiff,

and from defaming the plaintiff;

13

·Linda Cruz-Packer V. Pili Robinson
Linda Cruz-Packer V. Department of Youth Rehabilitation Services et. All
Opposition to all Defendant's and Pili Robinson's Motion to Dismiss Complaint

a)   that this court award the plaintiff judgment in her favor and against the

     Defendants jointly and severally;

b)   that this court award the plaintiff compensatory damages in the amount of

     $1,000,000.00, against the Defendants jointly and severally;

c)   that this court award the Plaintiff punitive damages against the Defendants

     jointly and severally in the amount of 500,000.00;

d)   and that this court award the Plaintiff such other and further relief as it deems

     necessary.

Through documentary and testimonial evidence, Plaintiff will be able to rebut

Defendant's assertion that he was not negligent in his duty as a Senior

Consultant/Expert, and that he did not do anything in connection to the plaintiff's

claims. Thus, defendant's relief should be denied because such relief is not permitted

under the rules of this court.


**Dated:  May 3, 2007**

### JURY DEMAND

Plaintiff demands a trail by jury on all issues trailble by a jury.


                                    Respectfully submitted,

                                    Linda Cruz-Packer
                                    Linda Cruz-Packer
                                    4800 Megan Drive
                                    Clinton, Maryland 20735
                                    (301) 234-0097
                                    (240) 602-4579


14

·Linda Cruz-Packer V. Pili Robinson
Linda Cruz-Packer V. Department of Youth Rehabilitation Services et. All
Opposition to all Defendant's and Pili Robinson's Motion to Dismiss Complaint

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3rd day of May 2007, a copy of the foregoing

opposition to Pili Robinson's motion to dismiss submitted by Attorney

Andrew T. Wise, was mailed postage prepaid to:

Pili Robinson
Andrew T. Wise, Esq.
Miller & CHEVALIER Chartered
655 15th Street NW
Suite 900
Washington, DC 20005

**Leah Brownlee Taylor**
**Assistant Attorney General**
**441 4th Street, NW**
**6th Floor South**
**Washington, DC 20001**

*Linda Cruz-Packer*

Linda Cruz-Packer

# OVERVIEW OF THE GENESIS PROGRAM

### Background

Genesis current Unit Manager is Linda Cruz-Packer who was assigned on August 9, 2006. The current staffing deployment consist of 10 Youth Development Specialist and one (1) Lead Youth Development Specialist. There are currently six residents enrolled in the Genesis Program ranging in ages 14 to 17 years of age Currently, there are no JJIC or assistant Unit managers assigned to the Genesis Program.

### Workforce Profile

**Age:** varies from age 27- 54 years of age
**Gender:** 6 males and 6 females (including Unit Manager)
**Race:** 11 African Americans one (1) Latino

Currently, Genesis does not have sufficient staffing. We are currently four staff personnel short; five considering we do not currently have an assistant unit manager or JJIC assigned to Genesis. Other staffing shortage is due to the following:

- Lakeba Watkins out on admin leave for positive urinalysis
- Donneatrice Brown reassigned to gatehouse due to being in their last trimester of pregnancy.
- Edward Valasquez resigned
- Christinia Perkins request pending to be reassigned to the gatehouse due to her pregnancy.

The ability to retain staff once the current staff leaves the Missouri training continues to be of concern. The lack of a social worker or JJIC since the opening of the Genesis program up to the date of this memo continues to be a critical matter and a terrific hindrance to the Genesis program. Particularly, it has become a handicap when it comes to its necessity for representation at treatment team meetings and for inputting pertinent information into the JIMMS system relating to the progress of the residents.

Note: Mr. Dunbar has requested that I received a pass code so that I have access to the JIMMS system, however I have not heard from Mr. Amble Prasad.

### Population and Capacity of the Genesis Unit

When Genesis opened in June of 2006, it opened with three residents. Its current population is 6 with a growth potential of 11. During a three month period from June 2006 through to the present, the population has increase 50%.

Complaints by some residents and their social workers have alleged that their selections process are being skewed by unknown criteria's for their selection or placement into the program. Other complaints from some social workers have centered on the fact that their

recommendations and residents identified for the program have been overlooked or completely ignored. These types of complaints have hurt the integrity of the program. In addition, the perceived impression that the selection or non selection of the more difficult residents, that is, having severe personality and behavior management disorders are not being considered for placement in the Genesis program, which has hurt the image of the program.

## Areas within Genesis that have been identified as needing improvement

- **Therapeutic treatment**- without a social worker or JJIC being assigned, it is hard to provide any treatment of any kind.
- **Creative problem solving**
- **Communication** and teamwork within the staff and management team
- **Consensus** building
- **Collective** group decision making
- **Active learning and role playing scenarios**
- **Diversity**
- **Counseling/and opportunities to lead groups**
- **There is a need to have AA and NA meetings held on the unit**
- **The criteria and residential selection process needs identifying**
- **Management needs to provide mentoring and interact more frequently with staff**
- **Morale boosters needed to be developed foe staff and residents associated with the Genesis program**

## Genesis Resident's Levels and related issues/ including home visit requirements

Prior to the opening of Genesis on June 15, 2006, prospective residents being considered as candidates for Genesis were informed that the levels in Genesis would be comprised of (six) 6 levels with a minimum requirement of a least 30 days to achieve each level. During a staffing meeting held on August 10, 2006, Pili Robinson, Consultant informed the resident that the (six) 6 level requirements were going to be compressed to four levels. Written documentation was also provided for the residents outlining expectations.

Seven weeks later at a staff meeting held on September 21, 2006, Consultant (CS) Robinson along with Deputy Superintendent (DS) Dexter Dunbar, again changed the Genesis Program, by verbally informing the residents without any written documentation that completion of the program was returning to a (six) 6 level concept. This counteracted all perceived understanding that the residents in the program had come to understand and accept. In addition, from the residents reaction to this change, it appeared to destroyed all trust and confidence in the program that the resident had.

More importantly, Deputy Supt. and Consultant, also changed completely the dynamics of the resident's requirements for a home visit. They verbally advised the residents that their first pass of the unit would be limited to a 4-6 hour pass. They **must** also be

accompanied by two DYRS staff members who are required to stay with them while they are off the facility. It might be necessary for this restriction to continue for the first three or four home visit before they received an unrestricted weekend home visit. Furthermore, Deputy Supt. emphasized to the residents that they must also complete their Genograms, life lines, and remain virtually incident free, which is critical in achieving their levels after level three.

The current resident levels in Genesis are as follows:

| Jose Santos | Level One | Santos Staff Advocate is R. Villalba |
| Kelvin Brown | Level One | Brown's Staff Advocate is T. Parker |
| Curtis Faisson | Level Two | Faisson's Staff Advocate is S. Hardy |
| Charles Yelverton | Level Two | Yelverton's Staff Advocate is D. Pugh |
| Marquee Jones | Level Three | Jones's Staff Advocate is G. Lofton |
| Deangelo Osborne | Level Three | Osborne's Staff Advocate is M. Simms |

The announced changes in level requirements upset the entire Genesis program, devastated the general well being and moods of the residents, and caused the staff serious concerns regarding their personal safety with the requirement of their having to escort the residents into the community. It should be noted that only one staff, Kevin Stith was comfortable with the upcoming escorting possibility.

Resident Marquee Jones had requested a weekend pass and efforts had begun to determine if his request could be met since he had reach level three. Dr. O and Charles Akinboyewa had been contacted along with his social worker Mr.Siti Bojan It was learned that a home assessment had not been completed so the home visit was put on hold. In the interim, Deputy Supt. had expressed his opinion that he didn't feel Marquee was ready for a home visit. However, the staff and the residents had voted that Marquee should be granted a home visit.

**Deputy Superintendent Dunbar and Consultant Pili Robinson's time spent on the Genesis Unit.**

**On Thursday, August 10, 2006,** my second day assigned to Genesis a scheduled staffing and team meeting took place.
1:30 pm Consultant Robinson on unit
1:40 pm Deputy Supt. Dunbar on unit

**August 13, 2006** (Sunday)

6::03 pm – 6:57 pm

54 minutes spent by Deputy Supt. Dunbar interacting with the residents to determine how they felt about the program and how things had progressed since the arrival of the new unit manager, Ms. Cruz-Packer.

**August 16, 2006** (Wednesday)

11:50 am  Consultant Robinson on unit
12:00 noon  Deputy Superintendent Dunbar on unit to bring wash cloths. Both spoke with residents for a brief period.

**Week of August 20 -26ᵗʰ**

Neither Consultant Robinson nor Deputy Dunbar did not visited unit the entire week.

**August 30, 2006** (Wednesday)

2:30 pm Consultant Robinson on unit to talk with the residents.

**Week of September 3 -- 9th**

Neither Consultant Robinson nor Deputy Supt. Dunbar did not visited unit the entire week.

**September 11, 2006** (Monday)

3:00 pm Depty Supt. Dunbar on unit and leaves at 3:17 pm.

**September 14, 2006** (Thursday)

3:10 pm Consultant Robinson and Deputy Dunbar on unit for staffing and team meeting

5:25 pm  Deputy Supt. Dunbar and  Consultant Robinson on unit

**September 18, 2006** (Monday)

12:30 pm Deputy Supt. Dunbar on unit and leaves at 12:40 pm

**September 19, 2006** (Tuesday)

11:30 am  Deputy Supt. Dunbar on unit 11:40 am  Dunbar leaves unit.

**September 21, 2006** (Thursday)

3:30 pm Deputy Supt. Dunbar arrives on unit

3:40 pm  Consultant Robinson arrives on unit.
Staffing and team meeting held.

Note: all the above times were taken from the Genesis log book and attachments will be provided for your review.

It should be noted that at no time outside of staffing and or team meetings on Thursday's was any training provided to the staff, nor any OJT training, role playing conducted with the staff or the residents, or any mentoring or bonding attempts made with the residents.

Upon the unit manager being assigned to Genesis on August 10th, 2006, she was requested to come in two hours early for training from either Deputy Supt. or Consultant.. However, due to unscheduled meetings or for other unknown meetings their schedules prevented them from meeting except for approximately 15 minutes one day that Deputy Supt. Dunbar afforded her.  During that meeting the discussion was related to levels, and it took place very hurriedly prior to a staffing meeting.

## PROGRAMS

Genesis staff provides assistance with the program development and oversight of various programs, and has oversight responsibility along with the monitoring of contract compliance delivered by contractors, and evaluates various programs effectiveness.

**DYRS- Programs and Services-** Please find below a list of programs available and the identified participation of the Genesis population.

**Medical** (all of Genesis residents have been involved)
**Mental Health Services** (Only Fassion has been involved to my knowledge)
**Substance abuse**
**Special Education**
**Academic** (All)
**GED Program** (Jones & Osborne)
**VAMP** (All)
**Vocational training** (Genesis involved with Barbering, Music, and Food Service)
**Drug testing** (All)

## Community Based Programs

**Substance Abuse**
**Drug Training**
Note: due to my limited exposure I am not fully aware of all the various Community based programs associated with DYRS

**Concerns about the proposed Shakespeare Program.**

After returning to work due to family medical issues regarding to my son, I attended a treatment team meeting held on the Genesis Unit on Wednesday, September. 21, 2006. I learned through the Vamp representative who attended the meeting, that allegedly Consultant P. Robinson wanted to pull the Vamp sponsored Shakespearean Program from Genesis. This was later confirmed through the Manager of the Vamp program, who had already started identifying and canvassing for possible replacements for the Genesis contingency, who had been chosen originally due to their long term status of remaining in the program for at least six months or longer.

During that same day at a Genesis group meeting, I inquired into the residents feelings about participating in the Shakespearean program. They related to me that Consultant P. Robinson allegedly said "Inter City youths don't need to participate in any Shakespeare program," if true, his statement could influenced their desire to participate. I later interviewed and noted each resident's opinion as to their desire to continue with the Shakespearean program. It was determine that they wanted to participate 100%.

Subsequently, at the opening of our staffing and team meeting on Thursday, September 21, 2006, I inquired of Consultant regarding the rumors that he had pulled the Shakespearean program while I had been away from work. He denied pulling the program, however he expressed some concerns about Vamp not arriving to the unit at their schedule times, the lack of a proper foundation and concerns regarding the process not being laid with the residents before the program was introduced to the residents.

Their was a difference of opinion between myself and the Consultant relating to the Shakespearean program, as well as, other program initiatives I have previously proposed to both Consultant and the Deputy Supt..

On Friday September 22, 2006, Ms. K Parker of Vamp, and Ms. Anderson, liaison to the Director, visited the Genesis unit and express their dismay upon hearing that the Shakespearean program was targeted to be pulled. They advised me that their Director was responding to the appropriate person(s) within DYRS to voice their concerns. They further advised that they wanted to meet with Superintendent Evans. As a result of this particular program issues and other programmatically related issues, I requested a meeting with the Superintendent to discuss their concerns. As a result of this meeting the Superintendent requested that I provided him with a written summation and overview of the Genesis Program and my concerns.

In the two months since I was requested to become the unit manger of Genesis, I have personally written and developed, as well as proposed several programs which would have included a mechanism for building and increasing self esteem, building character, brought exposure to new environmental horizons, could have been used to supplement a lack of emotional attachment and well being in the residents, providing them with an avenues to address or eliminate issues or factors which could be causing internal anxieties, aggressiveness, and provide assistance to improve their over all quality of life.

Linda Cruz-Packer
Overview of the Genesis Program
Prepared September 28, 2006

relevant to his country, and be able to identify his countries flag; Puppy Proposal, residents would have a puppy, and the puppy could reside in their room and be trained as a service dog; gardening proposal, residents would plant a garden or flowers and beautify the front of Genesis; Proposed Facials, where the residents learn about hygienic cleaning, and actually participate and perform facials on themselves; Cooking proposal, where the residents would bake various items in the microwave and be educated about the various food groups, bicycling and or fish proposal, where the residents would be allowed to actually own or have something they could identify with and love and nature and care for that would be their responsibility alone, and at they same time both their mental and physical health could be improve by the exercise sustained from riding a bike; tennis program proposal, where they would learn how to play tennis and learn to keep score, with the ultimate goal being to have an inter unit or staff against residents tennis tournament; Computer proposal, where ever residents would have their own individual computers, for educational and teaching purposes, once a way could be determined to block unacceptable websites and eliminate access to porn sites; Photography proposal, where each resident would have their own camera to shoot selected photo in and around the Oak hill facility; Proposed Over sleep in a tent event; where the resident will be taught to pitch a tent and cook over a self built fire; Proposal to attend a local Sporting event with staff, such as a Wizard, Redskin, Ravens, Nationals, or other local sports team event.

There was approval given for the following programs within Genesis Gardening, Facial, Cooking and also the proposed Shakespearean Program. Neither Mr. Dunbar or Mr. Robinson ever observed or participated in any of the above mentioned programs. However, not only did Superintendent Evans observe these programs but he also participated and baked a chocolate cake and joined in as a participant that subjected him to a facial. Mr. Evans participation had such a positive effect on the residents in that it help eliminate any reservations the boys had towards participating in new programs to the unit. In addition, Superintendent Evans set the tone for a positive male role model for the resident to emanate. His participation also help get rid of any notions that facials and learning to cook were femmine qualities.

It should be noted that if some of these other programs had been adopted they would have attacked cultural conditions, lack of limited family support, poor self esteem, boredom, perception that they the resident are not deserving of anything of substance, and that this program has some really good ideas and benefits for its participants. The proposals made by me created visions of how committed I was to doing and putting forth worthwhile ideas even without the support and knowledge that they would come to conclusion. None of us know what might have happened if most of these ideas would have been adopted.

I still feel that these proposed programs are viable and I am still willing to implement them if and when they are approved.

Linda Cruz-Packer
Overview of the Genesis Program
Prepared September 28, 2006

## Major Milestones or highlights of the Genesis Program

- **Genesis** opens as a new renovated unit June of 2006/
- As of August 9, 2006 there has been no assault on staff or any other incident on Genesis relating to aggressiveness.
- There is zero tolerance for drug usage in Genesis and no reported incidents as of August 9, 2006.
- Physical constraints have not had to been used since August 9, 2006.
- There continues to be no social worker or JJIC assigned to the Genesis program.
- Three of the Genesis resident are star players on the Oak Hill Academy Football team